Michael T. O'Halloran CLS-B (#99085)
LAW OFFICE OF MICHAEL T. O'HALLORAN
1010 Second Avenue, Suite 1727
San Diego, CA  92101
Telephone:  (619) 233-1727
Facsimile: (619) 233-6526

Proposed Counsel for Debtor In Possession

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 16-01709-LA11 |
| QUALITY DISCOUNT ICE CREAM DISTRIBUTIONS, INC., | DECLARATION OF NASSER PALIZBAN IN SUPPORT OF MOTION FOR APPROVAL OF CASH COLLATERAL AGREEMENT |
| Debtor in Possession. | Date: Jan. 12, 2017<br>Time: 2:30 p.m.<br>Dept: Two |

I, Nasser Palizban, declare:

1.   I am the president and founder of Quality Discount Ice Cream Distributors, Inc. ("QDIC" or "Debtor"), the debtor in possession.  This declaration is filed in support of the motion for approval of the cash collateral agreement between the Debtor and Bank of America ("Bank").  The facts stated herein are true of my own personal knowledge and if called as a witness, I could and would testify to such facts.

2.   QDIC was formed in May 1989.  Since its formation, QDIC has been engaged in ice cream sales.  Today its primary business is supplying ice cream to Walmart stores.

-1-

1      3.    QDIC is in the business of distribution of ice cream.
2  Generally, QDIC arranges for the delivery of frozen goods from a
3  producer or wholesaler to retail stores such as Walmart, liquor
4  stores, small groceries and other establishments which sell the
5  ice cream to customers for consumption.

6      4.    QDIC became in financial trouble when it expanded its
7  operation in order to take large new distribution opportunities
8  which ultimately did not occur.  QDIC incurred substantial new
9  overhead in anticipation of future growth. Compounding the
10 problem of expansion was that a new management team was retained
11 which imposed unprofitable new procedures and drove off existing
12 staff without benefit to QDIC.

13     5.    QDIC owes the Bank over $3,000,000 for money lent to it.
14 The Bank has a judgment against QDIC.  It holds a first priority
15 lien on the assets of QDIC created by a recorded UCC-1 form.

16     6.    The Bank has agreed to allow the Debtor to use its cash
17 collateral pursuant to a specific budget.  The agreement with the
18 budget is Exhibit A hereto.  That agreement is effective through
19 January 31, 2017.

20     7.    The Debtor will pay the Bank $5,000 in November and
21 December and at least $12,500 each month thereafter as adequate
22 protection of the Bank.

23     8.    Use of the cash collateral will allow the Debtor to
24 operate and grow.  It is striving to increase sales and the size
25 of the customer base.  Its goal is to pay back the debts of the
26 company with profits from a sustainable expansion. The Debtor has
27 to buy product that is desired by its customers, store that
28 product and deliver it to a number of locations.  It has payroll

-2-

1   and vendors to pay, as well as rent and salaries to management.
2   It is essential to have access to the Bank's cash collateral or
3   else the Debtor will not be able to operate. If the Debtor ceased
4   operations, the Bank would be entitled to seize the Debtor's
5   assets, leaving nothing for other creditors. The agreement is
6   very valuable to QDIC and should be approved by the court.  In
7   addition, I expect that extensions of the agreement will be
8   sought as well and should be approved for the reasons given
9   herein.

10

11      I declare under penalty of perjury that the foregoing is
12  true and correct and that this declaration is executed this 17th
13  day of November 2016, at Houston, Texas.

14

15                      /s/ Nasser Palizban
                        Nasser Palizban
16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re:<br><br>QUALITY DISCOUNT ICE CREAM<br>DISTRIBUTORS, INC.,<br><br>          Debtor and Debtor-in-<br>          Possession. | ) Case No.: 16-01709-LA11<br>)<br>) Chapter 11<br>)<br>) **STIPULATION FOR DEBTOR'S USE OF**<br>) **CASH COLLATERAL**<br>)<br>) DATE :    [TBD]<br>) TIME :    [TBD]<br>) JUDGE:   Hon. Louise DeCarl Adler<br>) CTRM.:<br>)<br>)<br>)<br>) |

This Stipulation Regarding Use of Cash Collateral and Adequate Protection (the "Stipulation") is entered into by and between Quality Discount Ice Cream Distributors, Inc. ("Debtor"), on the one hand, and Bank of America, N.A. ("Bank"), on the other hand, with reference to the following facts:

RECITALS

      A.    Petition. On March 29, 2016 (the "Petition Date"), petitioning creditors commenced the above-captioned Bankruptcy case (the "Bankruptcy Case") by filing an involuntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy

1  Code") in the United States Bankruptcy Court for the Southern District of California (the "Court").

2  The order for relief was entered on October 6, 2016.

3       B.    Jurisdiction and Venue. This Court has jurisdiction over the Bankruptcy Case, and

4  the parties and property affected thereby, pursuant to 28 U.S.C. §§ 157(b) and 1334. This

5  proceeding constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue for this

6  Bankruptcy Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7       C.    Debtor. The Debtor is a manufacturer and distributor of food products, operating

8  as a debtor in possession after entry of the order for relief.

9       D.    Bank's Loan.

10       1.    On or about July 1, 2013, Debtor executed and delivered to the Bank a Loan

11  Agreement in the face amounts of $2,000,000.00 for a Line of Credit ("LOC") and

12  $2,000,000.00 for a Term Loan ("Term Loan") for purposes of providing capital for the

13  operation of its business. Debtor agreed to repay the loans pursuant to the terms and

14  conditions contained in the Loan Agreement. The Loan Agreement was modified from

15  time to time, including pursuant to that certain Amendment to Loan Agreement dated

16  September 23, 2014. Concurrently with the execution of the Loan Agreement, Bank and

17  Debtor entered into a Commercial Security Agreement which, in addition to the Loan

18  Agreement described herein, governs the parties' rights and obligations with respect to the

19  loan made to the Debtor. A UCC-1 financing statement was recorded in support of the

20  Commercial Security Agreement. Copies of the Security Agreement and financing

21  statement are attached as Exhibit A.

22       2.    The indebtedness under the LOC as of the order for relief was

23  $2,158,235.27, including accrued attorneys' fees, allowable costs and charges, and other

24  amounts allowable under the LOC.

25       3.    The indebtedness under the loan as of the order for relief was $860,757.56,

26  including accrued attorneys' fees, allowable costs and charges, and other amounts

27  allowable under the Term Loan. Aggregate amounts owing under the LOC and the Term

28

2

1    Loan may be referred to as the Prepetition Indebtedness.

2         4.    By virtue of Debtor's Security Agreement, Bank has a first priority lien on

3    the assets, cash and accounts (the "Prepetition Collateral") of Debtor. All of the Debtor's

4    cash and proceeds generated by the Prepetition Collateral is "Cash Collateral" of Bank

5    within the meaning of Bankruptcy Code Section 363(a).

6         E.    Need for and Use of Cash Collateral. As a result of Bank's liens upon, and security

7    interests in, the Prepetition Collateral, and by virtue of Bankruptcy Code section 363(c)(2), the

8    Debtor is unable to use the Cash Collateral without the consent of Bank or the authorization of the

9    Court after notice and a hearing. The Debtor requests entry of an order of the Court approving this

10   Stipulation pursuant to Bankruptcy Rule 4001(b)(2) (the "Approval Order"), to allow the Debtor

11   the use of Cash Collateral (as defined below) for the preservation of the bankruptcy estate, and the

12   maintenance and continued operation of the Debtor's business.

13        F.    Anticipated Use of Cash Collateral. Debtor has requested, and subject to Court

14   approval, Bank has consented to, Debtor's use of Cash Collateral for purposes described in the

15   Budget attached hereto as Exhibit B (subject to the terms of this Stipulation), from the date of this

16   Stipulation through January 31, 2017.

17        G.    NOW, THEREFORE, based upon the foregoing and good cause appearing therefor,

18        IT IS HEREBY STIPULATED, CONSENTED TO AND AGREED by and among the

19   Debtor and Bank as follows:

20                            **STIPULATION**

21        1.    Incorporation. The recitals contained above are incorporated herein by this

22   reference.

23        2.    Indebtedness. The Debtor hereby acknowledges and agrees that the Debtor is liable

24   to Bank in the amount of the Prepetition Indebtedness.

25        3.    Validity of Claims. The Debtor acknowledges and agrees to the following:

26             a.    The Prepetition Indebtedness constitutes an allowed claim under the

27   Bankruptcy Code.

28

3

b.    The Prepetition Indebtedness is secured by a valid, perfected and indefeasible first priority security interest in the Prepetition Collateral.

4.    Collection and Use of Cash Collateral.

a.    "Cash Collateral" Defined.  "Cash Collateral" includes, without limitation, all cash, negotiable instruments, documents of title, securities, chattel paper, deposit accounts, or other cash equivalents whenever acquired in which the Debtor has an interest, and includes any and all proceeds, products, offspring, rents or profits of property and all fees, charges, accounts or other payments on the Prepetition Collateral or otherwise generated by or derived from the Prepetition Collateral (collectively, "Cash Collateral").

b.    Permitted Use of Cash Collateral. Subject to the terms of this Stipulation and the Approval Order, Bank hereby consents to Debtor's use of Cash Collateral, solely for the purposes and in the total amounts set forth in the Budget (the "Budget") attached hereto as Exhibit B and incorporated by this reference.  Debtor and Bank may agree to any amendments or modifications to the Budget or Budget Period (defined below) subject to further order of the Bankruptcy Court.

c.    Budget Period for Cash Collateral.  Debtor may use the Cash Collateral up to the amount and for the specific purposes set forth in the Budget for the period from the date of this Stipulation through January 31, 2017, or such later date as may be agreed to in writing by Bank and Debtor and approved by the Court (the "Budget Period").

5.    Adequate Protection Payment to Bank.  As and for adequate protection of Bank's interest in and consent to use of the Cash Collateral and as security for the Debtor's performance under this Stipulation, the Debtor shall make monthly payments under the LOC and Term Loan ("Loan Documents") in an amount not less than $5,000.00 for the months of November and December, 2016, and not less than $12,500.00 each month thereafter (each, an "Adequate Protection Payment" and collectively, the "Adequate Protection Payments"), payable on the first business day of each month during the Budget Period (the "Payment Day").

6.    Further Adequate Protection of Bank's Interests.  As protection for the interests of

4

1  Bank, in compliance with section 506(b) of the Bankruptcy Code, and in consideration of consent

2  to the Debtor's use of the Cash Collateral as set forth in this Stipulation:

3          a.    Bank is hereby granted a replacement lien (the "Replacement Lien") on the

4  rents, proceeds and profits of the Prepetition Collateral (collectively, the "Post-Petition

5  Collateral"), with such Replacement Lien being a perfected security interest in and to the

6  Postpetition Collateral having the same extent, validity and priority Bank had in the

7  Prepetition Collateral on the Petition Date.  The Replacement Lien shall be valid,

8  perfected, and enforceable as of the Petition Date without any further action by Debtor and

9  Bank and without the execution, filing, or recording of any financing statements, security

10  agreements, deeds of trust or other documents.

11          b.    Under Section 507(b) of the Bankruptcy Code, if the protection granted

12  above is insufficient to satisfy in full the claims of Bank, Bank will be granted an allowed

13  claim under Section 503(b) of the Bankruptcy Code in the amount of any such

14  insufficiency.  Such claim shall have the super-priority provided by Section 507(b) of the

15  Bankruptcy Code, and no claim for costs or expenses of administration that have been or

16  may be incurred in this case, any conversion of this case to a case under chapter 7 of the

17  Bankruptcy Code, or otherwise, and no priority claims, are or will be senior to or on a

18  parity with any such claim of Bank, subject only to fees payable to the U.S. Trustee under

19  28 U.S.C. § 1930 and fees or costs owing to the Clerk of the Court.

20      7.    Access to Collateral.  In order to provide further adequate protection to Bank for

21  Debtor's use of Cash Collateral, Debtor:

22          a.    Shall permit Bank and its agents access to inspect the Prepetition Collateral,

23  on 48 hours' notice to the Debtor; and

24          b.    Shall keep the Prepetition Collateral insured as required by the Loan

25  Documents.

26      8.    No Implied Authorization.  Except for transactions in the ordinary course of

27  business or as authorized by the Court, the Debtor shall not sell, transfer, lease, encumber, or

28
                                          5

1  otherwise dispose of any of the property of the estate without the prior written consent of Bank,

2  and no such consent shall ever be implied from any other action, inaction, or acquiescence by

3  Bank.

4      9.    Events of Default.  The occurrence of anyone or more of the following events shall

5  constitute an "Event of Default" under this Stipulation:  (i) Debtor fails to perform any of its

6  obligations in accordance with the terms hereof or otherwise defaults hereunder or breaches any

7  provision hereof, including (A) the use and disbursement of Cash Collateral except as expressly

8  permitted hereunder; (B) the actual expenditure of Cash Collateral by the Debtor in excess of the

9  budgeted expenditure in the Budget, without the written consent of Bank or order of the Court; (C)

10  the failure to provide any report, document, or information to Bank as required hereby; and (D) the

11  failure to make any payment to Bank as required hereby;  (ii) the Bankruptcy Case is converted to

12  a case under Chapter 7 or is dismissed; (iii) the Approval Order or this Stipulation is reversed,

13  vacated, stayed, amended, or supplemented without the consent of Bank; or (vi) relief from the

14  automatic stay is granted to any party to permit the exercise of remedies with respect to any

15  property of Debtor's estate.

16      10.    Remedies Upon Default.  If an Event of Default occurs under this Stipulation, Bank

17  shall give written notice via facsimile or overnight express of any such default to Debtor's counsel

18  of record in the Bankruptcy Case by electronic mail or facsimile (the "Default Notice"). Upon

19  receipt of such notice, Debtor shall have three (3) business days to cure the Event of Default.

20      11.    Effect of Default.  Upon the expiration of the third business day after delivery of

21  the Default Notice, if Debtor has not (i) cured the Event of Default that is the subject of the

22  Default Notice, or (ii) noticed an expedited hearing before the Court with respect to the Event of

23  Default that is the subject of the Default Notice, Debtor's rights to use Cash Collateral shall

24  immediately cease without further notice.  Furthermore, the Debtor shall hold and segregate all

25  Cash Collateral in trust for Bank.

26      12.    Right to Terminate Use of Cash Collateral.  Regardless of the occurrence of any

27  Event of Default, Bank may move the Court on regular notice for an order terminating the

28

6

1   Debtor's right to use Cash Collateral for any appropriate reason, including, but not limited to, lack

2   of adequate protection, relief from the automatic stay being granted to any party to permit the

3   exercise of remedies with respect to any property of Debtor's estate, failure to obtain Court

4   approval of the terms of this Stipulation, and/or the occurrence of one of the events set forth in

5   paragraph 9 hereof.

6       13.   Non-Budgeted Expenditures.  In the event Debtor wishes to make an expenditure of

7   Cash Collateral not expressly provided for in the Budget, Debtor shall notify Bank five (5)

8   calendar days before payment or use of Cash Collateral in writing of the amount and nature of the

9   proposed expenditure and provide to Bank such supporting documentation as may be necessary

10  for Bank to evaluate the necessity and propriety of the proposed expense.  In the event that the

11  Debtor does not receive written approval from Bank for the proposed use within five (5) business

12  days of the request, the request shall be deemed denied by Bank.  In the event that Bank consents

13  in writing to Debtor's expenditure of Cash Collateral, which consent shall be in the sole and

14  absolute discretion, opinion and judgment of Bank, then Debtor shall be entitled to expend Cash

15  Collateral subject to the terms of this Agreement as authorized by Bank in writing.  In the event

16  that the Debtor's request is denied by Bank in writing, the Debtor shall not use Cash Collateral to

17  pay that expense absent an order of the Court, and Bank agrees that the Debtor may present its

18  request to the Court on an emergency or ex parte basis.

19      14.   Section 364(e) of the Bankruptcy Code.  Having been found to have acted in good

20  faith in agreeing to the terms of this Stipulation, Bank shall be entitled to the full protection of

21  Section 364(e) of the Bankruptcy Code with respect to the Debtor's grant of the Replacement Lien

22  created and authorized by this Stipulation in the event that this Stipulation or any authorization

23  contained in this Stipulation is stayed, vacated, reversed, or modified on appeal.

24      15.   506(c) Waiver.  The Debtor, on behalf of himself and the estate, shall not seek any

25  right to surcharge Bank under Section 506(c) of the Bankruptcy Code or other applicable law for

26  any fees or compensation to attorneys or other professionals employed by the Debtor.

27      16.   No Deemed Lender Control.  Bank shall not be deemed to be in "control" of the

28

                                                7

1   operations of the Debtor, or to be acting as a "responsible person" or "owner" or "operator" with

2   respect to the operation or management of the Debtor solely by reason of any credit extended to

3   Debtor under the Loan Documents, or the grant to and/or exercise by any successor-in-interest of

4   any rights or remedies hereunder or thereunder.

5         17.   Reservation of Rights.  This Stipulation and the Approval Order do not prejudice

6   the right of Bank to seek relief from the automatic stay of Section 362 of the Bankruptcy Code, or

7   any other relief in this case, including demands for further adequate protection, objections and

8   claims relating to applications or motions for adequate protection, or the use, sale, or other

9   disposition of the Cash Collateral or the Post-Petition Collateral.  This Stipulation is also without

10  prejudice to the rights of any party to oppose any such relief requested. Except as otherwise

11  expressly set forth in this Stipulation, this Stipulation is not a waiver or modification of any of the

12  rights of Bank, including by way of example and without limitation all rights set forth in the Loan

13  Documents, and Bank does not have any obligation or duty to any other entity to exercise any of

14  its rights, remedies, claims, powers, benefits, and privileges.  Delay in or failure to exercise any of

15  its rights, remedies, claims, powers, benefits, or privileges does not constitute a waiver, nor

16  subject Bank to any liability to any entity, and no other entity may rely upon any such delay or

17  failure or in any way seek to assert a defense to any obligation owing based on any such delay or

18  failure.

19        18.   Successors and Assigns; Survival.  The provisions of this Stipulation shall be

20  binding and inure to the benefit of Bank, the Debtor and its estate, and the respective successors

21  and assigns of each of the foregoing.

22        19.   Modification of Stipulation and Effect of Modification of Order.  The terms and

23  conditions set forth in this Stipulation may not be altered, modified, or affected without the prior

24  written consent of the Debtor and Bank.  If any or all of the provisions of the Approval Order are

25  hereafter modified, vacated, terminated, amended or stayed, the consent to Debtor's use of Cash

26  Collateral shall cease immediately thereupon; provided, however, that no such occurrence shall

27  affect, limit or modify (a) the validity of any claim for any amounts of Cash Collateral used

28

8

1    pursuant to this Stipulation and the Approval Order, or (b) the validity, enforceability, priority or

2    perfection of any lien or security interest granted under this Stipulation and the Approval Order.

3          20.    Court Approval.  This Stipulation is subject to approval of the Court pursuant to

4    Federal Rule of Bankruptcy Procedure 4001(d).

5          21.    Unenforceability.  If the Court does not approve this Stipulation for any reason,

6    then this Stipulation has no effect, and neither the Stipulation nor any action or procedure taken,

7    nor any statement made, in connection with the negotiation, preparation, formulation or seeking

8    approval of this Stipulation may be referred to by any entity in connection with any proceeding or

9    action, whether in this case or elsewhere.

10          22.    No Agreement to Provide Financial Accommodation.  No provision of this

11    Stipulation and the Approval Order shall in any way impose upon Bank any duty or obligation to

12    provide any financing or financial accommodation to Debtor or any other party, to collect, sell,

13    lease or otherwise dispose of any of Bank's collateral, to proceed against any party, person,

14    individual or entity to proceed against or exhaust any security held by Bank, or any other party,

15    person, individual or entity, or to otherwise pursue any action, right or remedy in Bank's power

16    whatsoever.

17          23.    Consent and Mutual Agreement.  Whenever any action may be taken under this

18    Stipulation upon the prior written consent of Bank or the prior mutual written agreement of the

19    parties, the action may be taken without any further notice or action or order of the Court.

20          24.    Survival of Obligations.  The provisions of this Stipulation and any actions taken in

21    accordance with this Stipulation shall survive entry of any order that may be entered: (a)

22    confirming any plan in any case of any Debtor; (b) converting this Chapter 11 case to a case under

23    Chapter 7 of the Bankruptcy Code; or (c) dismissing this case.  Unless otherwise ordered by the

24    Court, the claims and liens on the Cash Collateral and the Post-Petition Collateral continue in full

25    force and effect and maintain their priority until all the obligations owed under the terms of the

26    Loan Documents and this Stipulation are paid in full.

27          25.    Counterpart.  This Stipulation may be executed in counterparts, each of which,

28
                                                9

1    when executed and delivered, shall be deemed an original, but all such counterparts together shall
2    constitute but one and the same instrument.

3        26.    Notice. Debtor shall, within one (1) business day following entry by this Court of
4    this Stipulation and Approval Order, mail copies hereof, to the U.S. Debtor, counsel to Bank and
5    to the entities listed on the Debtor's list of its twenty (20) largest non-insider unsecured creditors,
6    all parties who appear or otherwise responded to the relief requested herein, and any other party
7    that has filed a special request for notice with this Court and served such request upon Debtor's
8    counsel.

9        SO STIPULATED

10   DATED: October ____, 2016            HEMAR, ROUSSO & HEALD, LLP
11
12                                        BY: _____
13                                            WAYNE R. TERRY
                                              Attorneys for Creditor,
14                                            Bank of America, N.A.
15
16   DATED: October ____, 2016            LAW OFFICES OF MICHAEL T. O'HALLORAN
17
18                                        BY: _____
19                                            MICHAEL T. O'HALLORAN
                                              Attorneys for Debtor
20                                            Quality Discount Ice Cream Distributors, Inc.
21
22
23
24
25
26
27
28
                                        10





### SECURITY AGREEMENT
### (Multiple Use)

1. **THE SECURITY.** The undersigned Quality Discount Ice Cream Distributors, Inc. (the "Pledgor") hereby assigns and grants to Bank of America, N.A., its successors and assigns ("BANA"), and to Bank of America Corporation and its subsidiaries and affiliates (BANA and all such secured parties, collectively, the "Bank") a security interest in the following described property now owned or hereafter acquired by the Pledgor ("Collateral"):

(a) All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to the Pledgor from a factor; rights to payment of money from the Bank under any Swap Contract (as defined in Paragraph 2 below); and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b) All inventory, including all materials, work in process and finished goods.

(c) All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by the Pledgor, (including, but not limited to, the equipment described in the attached Equipment Description, if any).

(d) All negotiable and nonnegotiable documents of title covering any Collateral.

(e) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(f) All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(g) All books data and records pertaining to any Collateral whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

2. **INDEBTEDNESS.** The Collateral secures all obligations to the Bank under the following agreement, including any amendments, renewals or replacements thereof: Loan Agreement dated July 1, 2013 between Bank and Quality Discount Ice Cream Distributors, Inc. Each party obligated under such agreement is referred to as a "Debtor." The Collateral also secures all obligations to the Bank arising under any Swap Contract and any Treasury Services Contract now or hereafter entered into between any Debtor and the Bank; provided, that with respect to a Pledgor, the Collateral of such Pledgor shall not secure obligations arising under any Swap Contract to which it is not party if, and to the extent that, all or a portion of the guaranty by such Pledgor to the Bank of, or the grant by such Pledgor of a security interest to the Bank to secure, such Swap Contract, would

Ref #: ███████6815 . - Quality Discount Ice Cream Distributors, Inc
Security Agreement (Multiple Use)

1

violate the Commodity Exchange Act by virtue of such Pledgor's failure to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guaranty or grant of such security interest becomes effective with respect to such Swap Contract. "Commodity Exchange Act" means 7 U.S.C. Section 1 *et seq.*, as amended from time to time, any successor statute, and any rules, regulations and orders applicable thereto. All of the obligations secured under this Agreement are collectively referred to as the "Indebtedness.

"Swap Contract" means any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions. "Treasury Services Contract" means any contract between the Debtor and the Bank covering treasury management services, including, but not limited to, intraday credit, Automated Clearing House (ACH) services, foreign exchange services, daylight overdrafts, corporate credit card programs, wire transfers, electronic funds transfers, electronic trade services, controlled disbursement and zero balance arrangements.

3. PLEDGOR'S COVENANTS. The Pledgor represents, covenants and warrants that unless compliance is waived by the Bank in writing:

(a) The Pledgor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b) The Pledgor resides (if the Pledgor is an individual), or the Pledgor's chief executive office (if the Pledgor is not an individual) is located, in the state specified on the signature page hereof. In addition, the Pledgor (if not an individual or other unregistered entity), is incorporated in or organized under the laws of the state specified on such signature page. The Pledgor shall give the Bank at least thirty (30) days notice before changing its residence or its chief executive office or state of incorporation or organization. The Pledgor will notify the Bank in writing prior to any change in the location of any Collateral, including the Books and Records.

(c) The Pledgor will notify the Bank in writing prior to any change in the Pledgor's name, identity or business structure.

(d) Unless otherwise agreed, the Pledgor has not granted and will not grant any security interest in any of the Collateral except to the Bank, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of the Bank.

(e) The Pledgor will promptly notify the Bank in writing of any event which affects the value of the Collateral, the ability of the Pledgor or the Bank to dispose of the Collateral, or the rights and remedies of the Bank in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f) The Pledgor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect the Bank's security interest (collectively, the "Collateral Costs"). Without waiving the Pledgor's default for failure to make any such payment, the Bank at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. The Pledgor agrees to reimburse the Bank on demand for any Collateral Costs so incurred.

(g) Until the Bank exercises its rights to make collection, the Pledgor will diligently collect all Collateral.

(h) If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, the Pledgor shall immediately deliver such document to the Bank, together with any necessary endorsements.

(i) The Pledgor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of the Bank; provided, however, that the Pledgor may sell inventory in the ordinary course of business.

(j) The Pledgor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage, and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to the Bank, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to the Bank and include a loss payable endorsement in favor of the Bank in a form acceptable to the Bank. Upon the request of the Bank, the Pledgor will deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

(k) The Pledgor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless the Pledgor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by the Bank of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to the Bank and shall provide that the Bank has no liability to such owner, holder of any lien, or any other person.

4. ADDITIONAL OPTIONAL REQUIREMENTS. The Pledgor agrees that the Bank may at its option at any time, whether or not the Pledgor is in default:

(a) Require the Pledgor to deliver to the Bank (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b) Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c) Require the Pledgor to deliver to the Bank any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to the Bank the proceeds of any such letters of credit.

(d) Notify any account debtors, any buyers of the Collateral, or any other persons of the Bank's interest in the Collateral.

5. DEFAULTS. Any one or more of the following shall be a default hereunder:

(a) Any Indebtedness is not paid when due, or any default occurs under any agreement relating to the Indebtedness, after giving effect to any applicable grace or cure periods.

(b) The Pledgor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of the Pledgor to the Bank, and such breach remains uncured after any applicable cure period.

(c) The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in the Collateral.

(d) Any custodian, receiver or trustee is appointed to take possession, custody or control of all or a substantial portion of the property of the Pledgor or of any guarantor or other party obligated under any Indebtedness.

(e) The Pledgor or any guarantor or other party obligated under any Indebtedness becomes insolvent, or is generally not paying or admits in writing its inability to pay its debts as they become due, fails in business, makes a general assignment for the benefit of creditors, dies, or

commences any case, proceeding or other action under any bankruptcy or other law for the relief of, or relating to, debtors.

(f) Any case, proceeding or other action is commenced against the Pledgor or any guarantor or other party obligated under any Indebtedness under any bankruptcy or other law for the relief of, or relating to, debtors.

(g) Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

(h) The Pledgor has given the Bank any false or misleading information or representations.

6. BANK'S REMEDIES AFTER DEFAULT. In the event of any default, the Bank may do any one or more of the following, to the extent permitted by law:

(a) Declare any Indebtedness immediately due and payable, without notice or demand.

(b) Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c) Enforce the security interest of the Bank in any deposit account of the Pledgor maintained with the Bank by applying such account to the Indebtedness.

(d) Require the Pledgor to obtain the Bank's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e) Require the Pledgor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Bank in kind.

(f) Require the Pledgor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under the Bank's exclusive control.

(g) Require the Pledgor to assemble the Collateral, including the Books and Records, and make them available to the Bank at a place designated by the Bank.

(h) Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of the Pledgor's equipment, if the Bank deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i) Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Pledgor irrevocably authorizes the Bank to endorse or sign the Pledgor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Pledgor and remove therefrom any payments and proceeds of the Collateral.

(j) Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Pledgor.

(k) Use or transfer any of the Pledgor's rights and interests in any Intellectual Property now owned or hereafter acquired by the Pledgor, if the Bank deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Pledgor agrees that any such use or transfer shall be without any additional consideration to the Pledgor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software,

service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Pledgor has any right or interest, whether by ownership, license, contract or otherwise.

(l) Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m) Take such measures as the Bank may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Pledgor hereby irrevocably constitutes and appoints the Bank as the Pledgor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n) Without notice or demand to the Pledgor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by the Bank or any of the Bank's agents or affiliates to or for the credit of the account of the Pledgor or any guarantor or endorser of the Pledgor's Indebtedness.

(o) Exercise any other remedies available to the Bank at law or in equity.

7. MISCELLANEOUS.

(a) Any waiver, express or implied, of any provision hereunder and any delay or failure by the Bank to enforce any provision shall not preclude the Bank from enforcing any such provision thereafter.

(b) The Pledgor shall, at the request of the Bank, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as the Bank may reasonably deem necessary.

(c) All notes, security agreements, subordination agreements and other documents executed by the Pledgor or furnished to the Bank in connection with this Agreement must be in form and substance satisfactory to the Bank.

(d) This Agreement is governed by and shall be interpreted according to federal law and the laws of California. If state or local law and federal law are inconsistent, or if state or local law is preempted by federal law, federal law governs. If the Bank has greater rights or remedies under federal law, whether as a national bank or otherwise, this paragraph shall not be deemed to deprive the Bank of such rights and remedies as may be available under federal law. Jurisdiction and venue for any action or proceeding to enforce this Agreement shall be the forum appropriate for such action or proceeding against the Debtor, to which jurisdiction the Pledgor irrevocably submits and to which venue the Pledgor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith.

(e) All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f) All terms not defined herein are used as set forth in the Uniform Commercial Code.

(g) In the event of any action by the Bank to enforce this Agreement or to protect the security interest of the Bank in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any

Collateral, the Pledgor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)  In the event the Bank seeks to take possession of any or all of the Collateral by judicial process, the Pledgor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)  This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between the Bank and the Pledgor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)  The Bank's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by the Bank of any of the Indebtedness or the Collateral, the Bank thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the Bank shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred.  All representations, warranties and agreements of the Pledgor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of the Pledgor.

(k)  As stated in the preamble to this Agreement, the secured parties covered by this Agreement include BANA as well as Bank of America Corporation and its subsidiaries and affiliates. Such secured parties are collectively referred to as the "Bank." If, from time to time, any of the Indebtedness covered by this Agreement includes obligations to entities other than BANA, then BANA shall act as collateral agent for itself and all such other secured parties.  Any financing statements, control agreements and other steps taken to perfect the security interests under this Agreement may be made solely in the name of BANA, without expressly disclosing BANA's role as collateral agent.  Unless the context otherwise requires, each reference to "Bank" in this Agreement shall refer to each secured party covered by this Agreement.  Any enforcement actions under this Agreement will be taken by BANA as collateral agent, unless otherwise agreed by BANA and one or more of the other secured parties.  BANA shall have the right to apply proceeds of the Collateral against debts, obligations or liabilities constituting all or part of the Indebtedness in such order as BANA may determine in its sole discretion, unless otherwise agreed by BANA and one or more of the other secured parties.

8.  **FINAL AGREEMENT.**  BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

Date: **July 1, 2013**

BANK OF AMERICA, N.A.

By: ~~Lee Morrison, Vice President~~

Lori Wood, Officer

Address for Notices:
Doc Retention - GCF
CT2-515-BB-03
70 Batterson Park Road
Farmington, CT  06032

**Quality Discount Ice Cream Distributors, Inc.**

By: Nasser Palizban, President

By: Wanda I. Palizban, Secretary

Pledgor's Location (principal residence,
if the Pledgor is an individual;
chief executive office, if
the Pledgor is not an individual):

2465 Coral St
Vista, California  92081-8431

Pledgor's state of incorporation
or organization (if Pledgor is a corporation, partnership,
limited liability company or other registered entity): California

Mailing Address (if different
from above):

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Gisella Melendez
800-331-3282

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CT LIEN SOLUTIONS
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

DOCUMENT NUMBER: 38410250002
FILING NUMBER: 13-7367927500
FILING DATE: 07/03/2013 11:00
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | |
|---|---|
| 1a. ORGANIZATION'S NAME | Quality Discount Ice Cream Distributors, Inc. |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2465 Coral St | Vista | CA | 92081-8431 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Corporation | CA | C1840814 ☐NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| | |
|---|---|
| 2a. ORGANIZATION'S NAME | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| | |
|---|---|
| 3a. ORGANIZATION'S NAME | Bank of America, N.A. |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4161 Piedmont Parkway | Greensboro | NC | 27410-8110 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**
All Business Assets - Hot Docs Security Agreement The following described property now owned or hereafter acquired by the Pledgor ("Collateral"):(a) All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to the Pledgor from a factor; rights to payment of money from the Bank under any Swap Contract; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.(b) All inventory, including all materials, work in process and finished goods.(c) All machinery, furniture, fixtures and equipment of every type now owned or hereafter acquired by the Pledgor, (including, but not limited to, the equipment described in the attached Equipment Description, if any).(d) All negotiable and nonnegotiable documents of title covering any Collateral.(e) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.(f) All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any

**5. ALT DESIGNATION:** ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
CA-0-38816222-47575573

FILING OFFICE COPY

Page 2

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| Quality Discount Ice Cream Distributors, Inc. | |

OR | **9b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME, SUFFIX** |

**10. MISCELLANEOUS:**

DOCUMENT NUMBER: 38410290002
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | | | |
|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | |

OR | **11b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

| **11c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

| **11d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **11e. TYPE OF ORGANIZATION** | **11f. JURISDICTION OF ORGANIZATION** | **11g. ORGANIZATIONAL ID#, if any** ☐ NONE |
|---|---|---|---|---|

**12.** ☐ **ADDITIONAL SECURED PARTY'S or** ☐ **ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| | |
|---|---|
| **12a. ORGANIZATION'S NAME** | |

OR | **12b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

| **12c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

**13. This FINANCING STATEMENT covers** ☐ **timber to be cut or** ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14. Description of real estate:**

**15. Name and address of RECORD OWNER of above-described real estate**
**(if Debtor does not have a record interest):**

**16. Additional collateral description:**

Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral.(g) All books and records pertaining to any Collateral, including but Not limited to any computer-readable memory and any computer hardware or software necessary to process such memory.

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

**FILING OFFICE COPY**

G/L Income Statement - Comparative
**CONSOLIDATED** - ALL G/L ACCOUNTS

| DESCRIPTION | 08/01/2016 | 09/01/2016 | PROJECTION 10/1/2016 | PROJECTION 11/1/2016 | PROJECTION 12/1/2016 | PROJECTION 1/1/2017 |
|---|---|---|---|---|---|---|
| **INCOME & EXPENSE** | | | | | | |
| **REVENUE** | | | | | | |
| SALES - ICE CREAM PRODUCTS | 139,308.24 | 102,843.36 | 108,000.00 | 84,000.00 | 125,000.00 | 155,000.00 |
| SALES - ICE CREAM PRODUCTS - SUB-DISTRIBUTION | 85,041.60 | 56,981.76 | 46,000.00 | 29,000.00 | 50,000.00 | 67,000.00 |
| SALES - ICE CREAM PRODUCTS- DRAYAGE | 7,300.60 | 37,346.00 | 55,000.00 | 44,000.00 | 45,000.00 | 59,000.00 |
| PRODUCT DISCOUNTS GIVEN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MANUFACTURER PRICE REBATES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FUNDING PER UNI PER CONTRACT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL | 231,650.44 | 197,171.12 | 209,000.00 | 157,000.00 | 220,000.00 | 281,000.00 |
| TOTAL   REVENUE | 231,650.44 | 197,171.12 | 209,000.00 | 157,000.00 | 220,000.00 | 281,000.00 |
| **COST OF GOODS SOLD** | | | | | | |
| COST OF SALES - ICE CREAM PRODUCTS | 71,096.24 | 47,098.42 | 45,000.00 | 36,000.00 | 59,000.00 | 79,000.00 |
| COST OF SALES - ICE CREAM PRODUCTS - SUB-DISTRIBUTION | 70,584.53 | 47,294.86 | 38,180.00 | 24,070.00 | 41,500.00 | 55,610.00 |
| COST OF SALES - ICE CREAM PRODUCTS - DRAYAGE | 4,643.18 | 23,752.06 | 34,980.00 | 27,984.00 | 28,620.00 | 37,524.00 |
| FREIGHT EXP-ICE CREAM DELIVERY | 4100.00 | 2600.00 | 2200.00 | 1000.00 | 3000.00 | 4300.00 |
| INVENTORY ADJUSTMENTS - ICE CREAM | -7014.45 | 209.53 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVOICE ADJ - OVER/UNDER CHARGED | -2826.00 | 123.12 | -100.00 | -100.00 | -100.00 | -100.00 |
| ADJUSTMENTS/PROMO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| VENDOR ADJUSTMENTS/MELTDOWNS | 3262.45 | 1581.57 | 2000.00 | 1000.00 | 2000.00 | 4000.00 |
| PRODUCT DISCOUNTS TAKEN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL | 143,845.95 | 122,659.55 | 122,260.00 | 89,954.00 | 134,020.00 | 180,334.00 |
| TOTAL   COST OF GOODS SOLD | 143,845.95 | 122,659.55 | 122,260.00 | 89,954.00 | 134,020.00 | 180,334.00 |
| **GROSS PROFIT/(LOSS)** | 87,804.49 | 74,511.57 | 86,740.00 | 67,046.00 | 85,980.00 | 100,666.00 |
| **OPERATING EXPENSES** | | | | | | |
| WAREHOUSE REPAIR & MAINT | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 |
| WAREHOUSE - RENTAL EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 200.00 | 400.00 |
| WAREHOUSE - REPAIR EQUIPMENT/ELECTRICAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| WAREHOUSE - (BUILDING) RENT | 1,872.00 | 1,872.00 | 0.00 | 6,932.00 | 6,932.00 | 6,932.00 |
| TRAVEL- LODGING | 516.74 | 209.13 | 150.00 | 100.00 | 150.00 | 300.00 |
| TRAVEL - MEALS PER DIEM | 169.95 | 82.51 | 75.00 | 60.00 | 75.00 | 150.00 |
| FLEET - TRUCK RENTAL | 444.64 | 337.76 | 600.00 | 0.00 | 600.00 | 600.00 |
| FLEET - OUTSIDE REPAIRS & MAIN. | 4,617.00 | 1,102.93 | 1,000.00 | 1,000.00 | 1,500.00 | 3,000.00 |
| FLEET - PARTS | 27.30 | 0.00 | 20.00 | 20.00 | 300.00 | 400.00 |
| FLEET - TOWING | 540.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| FLEET - FLUIDS | 127.98 | 0.00 | 150.00 | 150.00 | 150.00 | 150.00 |
| FLEET - ENTERPRISE | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 4,750.00 |
| FLEET - TIRES | 250.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| FLEET - AUTO EXPENSES | 595.64 | 595.64 | 595.64 | 595.64 | 595.64 | 595.64 |
| FUEL - FLEET | 3,879.28 | 2,350.22 | 3,200.00 | 2,400.00 | 3,400.00 | 3,600.00 |
| DEBT SERVICE- BANK OF AMERICA NOTE | 0.00 | 0.00 | 5,000.00 | 5,000.00 | 5,000.00 | 10,000.00 |
| PAYROLL | 49229.46 | 47355.37 | 46000.00 | 44000.00 | 46000.00 | 48000.00 |

| | | | | | |
|---|---|---|---|---|---|
| PAYROLL TAXES | 3,177.73 | 3,910.00 | 3,740.00 | 3,910.00 | 4,080.00 |
| PAYROLL SERVICE | 520.95 | 290.00 | 290.00 | 290.00 | 290.00 |
| PAYROLL - CONTRACT LABOR | 0.00 | 600.00 | 0.00 | 700.00 | 1,000.00 |
| WALMART REFRIG & ELECTRICAL | 0.00 | 900.00 | 0.00 | 500.00 | 500.00 |
| WALMART FREEZER REFURB | 0.00 | 1500.00 | 0.00 | 0.00 | 2000.00 |
| WALMART SET-UPS Supplies | 0.00 | 300.00 | 300.00 | 0.00 | 1500.00 |
| CPA- SERVICES | | 1191.00 | 500.00 | 500.00 | 500.00 |
| BANK SERVICE CHARGES | 19.95 | 20.00 | 20.00 | 20.00 | 20.00 |
| COMMUNICATIONS - MOBILITY | 908.84 | 445.00 | 445.00 | 445.00 | 445.00 |
| COMMUNICATIONS - WIRELINE/INTERNET | 102.18 | 250.00 | 250.00 | 250.00 | 250.00 |
| UTILITIES - GAS & ELECTRIC | 1,450.64 | 2,300.00 | 2,300.00 | 2,300.00 | 2,300.00 |
| UTILITIES - WASTE DISPOSAL SERVICE | 141.00 | 141.00 | 141.00 | 141.00 | 141.00 |
| INSURANCE GENERAL LIABILITY | 816.16 | 335.00 | 335.00 | 335.00 | 335.00 |
| INSURANCE WC | 850.00 | 850.00 | 850.00 | 850.00 | 900.00 |
| INSURANCE AUTO | 1,881.70 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 |
| LICENSE & FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 40.00 | 40.00 | 40.00 | 40.00 |
| OFFICE - POSTAGE, FREIGHT, & COURIER SERVICE | 25.78 | 50.00 | 50.00 | 50.00 | 50.00 |
| I.T.- SOFTWARE SUBSCRIPTIONS & ANNUAL | 108.93 | 260.00 | 260.00 | 260.00 | 260.00 |
| **TOTAL** | 73,609.42 | 81,672.64 | 81,278.64 | 87,093.64 | 95,588.64 |
| **OPERATING EXPENSES** | 73,609.42 | 81,672.64 | 81,278.64 | 87,093.64 | 95,588.64 |
| **NET OPERATING INCOME/(LOSS)** | $902.15 | $5,067.36 | -$14,232.64 | -$1,113.64 | $5,077.36 |

NON- OPERATING EXPENSES

| | | |
|---|---|---|
| LEGAL FEES | 2,500.00 | 8,291.00 |
| WAREHOUSE REPAIR & MAINT (MOVING EXPENSE) | 3,326.90 | 0.00 |
| WAREHOUSE - RENTAL EQUIPMENT (MOVING EXPENSE) | 3,368.00 | 944.60 |
| WAREHOUSE - REPAIR /ELECTRICAL (MOVING EXPENSE) | 3,855.00 | 1,767.00 |
| PAYROLL - CONTRACT LABOR (MOVING EXPENSE) | 3,341.40 | 2,140.00 |
| FLEET - TRUCK RENTAL (MOVING EXPENSE) | 2,800.00 | 1,600.00 |
| **TOTAL** | 19,191.30 | 14,742.60 |